UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| ESTATE OF BETTY SIMS, | ) |
| BRANDY HERRIN, | ) |
| LAVINIA SABATINO, | ) |
| DAVID O'NEAL, | ) |
| AARON SIMMONS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FAITH FAMILY PRACTICE, LLC, | ) |
| FFP SUB, LLC, | ) |
| FREDDIE HENDERSON, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Ms. Sims died of sepsis because medical staff at the Pierce County jail ignored a simple urinary tract infection. This case is brought by the Estate of Betty Sims and her four surviving children, Brandy Herrin, Lavinia Sabatino, David O'Neal, and Aaron Simmons, against Lt. Freddie Henderson of the Pierce County Sheriff's Office and the medical contractor at the Pierce County jail, FFP Sub, LLC, and its parent company, Faith Family Practice, LLC.

### Allegations common to all counts

1. Plaintiff Estate of Betty Sims is administered by David Lee Cranfill, who was appointed on November 8, 2023.

1

2. The conduct which forms the basis of this lawsuit occurred in Pierce County, Georgia, which is within the Waycross Division of the Southern District of Georgia.

3. Betty Sims was arrested and incarcerated at the Pierce County Jail on March 21, 2023.

## Count I

4. This count is alleged against Defendant Faith Family Practice, LLC, and Defendant FFP Sub, LLC by Plaintiffs Herrin, Sabatino, O'Neal, Simmons. This count incorporates paragraphs 1–3.

5. Plaintiffs Brandy Herrin, Lavinia Sabatino, David O'Neal, and Aaron Simmons are the sole surviving children of Ms. Sims.

6. Defendant FFP Sub, LLC, is a Georgia limited liability company whose principal office is located at 11608 Central Avenue, Hoboken, GA 31542.

7. Defendant Faith Family Practice, LLC, is a Georgia limited liability company whose principal office is located at 11608 Central Avenue, Hoboken, GA 31542.

8. At all times relevant to this complaint, Defendant FFP Sub, LLC, and Defendant Faith Family Practice, LLC (collectively "Defendant FFP") were contractually obligated to provide medical services to all persons

incarcerated in the Pierce County jail and were the sole medical contractors at the jail.

9. On May 4, 2023, Ms. Sims requested a medical appointment during which she complained that she was having right flank pain.

10. Physician Assistant Dillon Vial, PA-C, prescribed Ms. Sims 500 mg of ciprofloxacin to be taken twice daily. Dr. Jerry Mullins, MD, co-signed the treatment note.

11. Both Dillon Veal and Jerry Mullins were employees of Faith Family Practices from May 4, 2023, to May 22, 2023.

12. The initial treatment plan consisted of oral antibiotic therapy and a follow-up urinalysis if Ms. Sim's symptoms did not improve.

13. On May 12, Ms. Sims reported that ciprofloxacin was making her vomit and that she continued to have upper right flank pain.

14. In response, PA Veal discontinued ciprofloxacin and prescribed nitrofurantoin to be taken twice daily for ten days.

15. Nitrofurantoin is not an effective antibiotic to treat an upper urinary tract infection because it requires adequate renal function to concentrate in the urine. If a patient has reduced kidney function due to an infection, the drug does not reach therapeutic levels in the urinary tract.

16. Prescribing nitrofurantoin was tantamount to discontinuing all antibiotic treatment for Ms. Sims.

17. After Ms. Sims reported that her symptoms had not improved on May 12, no medical provider performed any follow-up testing.

18. In contradiction to Ms. Sims' treatment plan, no medical provider performed a urinalysis after she reported that her symptoms had not improved.

19. No provider performed a urine culture at any point during Ms. Sims' incarceration.

20. The decision not to perform a urine culture on May 12 was a violation of the professional standard of care owed to Ms. Sims.

21. Every competent certified physician assistant and every competent physician would have ordered a urine culture in a patient whose symptoms of an upper urinary tract infection had not improved after taking ciprofloxacin for eight days.

22. The purpose of a urine culture is to allow the provider to determine what organism is infecting the patient, to prescribe the appropriate antibiotic treatment, and to detect the presence of a drug-resistant organism.

23. If performed, a urine culture would have shown that Ms. Sims was infected by a drug-resistant strain of Escherichia coli.

24. Every competent medical provider would interpret the results of a urine culture as showing that Ms. Sims was infected by a drug-resistant strain of Escherichia coli and would have required immediate hospitalization.

25. In the hospital setting, Ms. Sims' infection would have been treatable with intravenous antibiotics, continuous monitoring, and other supportive care.

26. In the jail setting, it was impossible to provide adequate treatment to Ms. Sims, and it was inevitable that she would die.

27. Nitrofurantoin is not an effective antibiotic for upper urinary tract infections. The decision to discontinue ciprofloxacin and prescribed nitrofurantoin was tantamount to discontinuing all antibiotic treatment.

28. No medical provider scheduled a follow-up appointment with Ms. Sims between May 12, 2023, and May 22, 2023.

29. By May 22, 2023, Ms. Sims' infection had become septic. She was in septic shock and gravely ill.

30. By the morning of May 22, 2023, Ms. Sims was so weak she could barely walk and was in constant pain.

31. On May 22, 2023, at about 8:00 a.m., Nurse Regina O'Neal, LPN, assessed Ms. Sims.

32. May 22, 2023, was the first time any medical provider at the jail saw Ms. Sims since her May 12, 2023, medical visit.

33. On May 22, 2023, Ms. Sims' vital signs and other outward manifestations indicated that Ms. Sims was in the midst of a medical crisis and required immediate hospitalization.

34. Ms. Sims was eventually taken to the hospital by jail staff.

35. At the hospital, tests confirmed that her infection had spread, shutting down her kidneys and slowing her heart.

36. The same day as her arrival at the hospital, Ms. Sims was intubated, and later died with her family at her bedside at 7:23 p.m.

37. Defendant Faith Family Practice, LLC, and Defendant FFP Sub, LLC, are liable for the full value of Ms. Sims' life as a result of the professional negligence of their employees under Georgia law.

## Count II

38. This count is alleged against Defendant FFP Sub, LLC, and Defendant Faith Family Practice by the Estate of Betty Sims. This count incorporates paragraphs 1–37.

39. Between May 12, 2023, and her death on May 22, 2023, Ms. Sims' health declined as the infection spread. Ms. Sims experienced emotional distress and physical pain during this time.

40. Defendant Faith Family Practice, LLC, and Defendant FFP Sub, LLC, are liable for the pain and suffering she experienced as a result of their employees' negligence under Georgia law.

## Count III

41. This count is alleged against Defendant Freddie Henderson in his individual capacity by the Estate of Betty Sims. This count incorporates the allegations set forth in paragraphs 1–3.

42. At all times relevant to this complaint, Defendant Henderson was employed by the Pierce County Sheriff's Office and was a supervisor in the Pierce County jail.

43. Between May 4, 2023, and May 22, 2023, Ms. Sims health declined while incarcerated in the Pierce County Jail.

44. On the morning of May 22, 2023, Ms. Sims' infection had become septic. She was in septic shock and gravely ill.

45. Because of her obvious deterioration, jail staff moved Ms. Sims out of her cell and into a multipurpose room at the jail.

46. When she arrived at the jail, jail staff asked Nurse O'Neal to assess Ms. Sims.

47. While assessing Ms. Sims, Nurse O'Neal reassured Ms. Sims that she would be taken to the hospital for treatment.

48. After assessing Ms. Sims, Nurse O'Neal informed Defendant Henderson that Ms. Sims required immediate hospitalization.

49. Defendant Henderson told Nurse O'Neal that he would not send Ms. Sims to the hospital.

50. Nurse O'Neal then left the jail to attend to a private matter with the understanding that Defendant Henderson would be immediately ensure that she was transport to the hospital.

51. At the time Nurse O'Neal informed Defendant Henderson of the need to transport Ms. Sims, Ms. Sims was unable to walk steadily, unable to sit still, was pale, unable to communicate effectively, and was otherwise in an obvious state of weakness and distress.

52. Defendant Henderson observed Ms. Sims and it was obvious to him that she required immediate medical attention that could not be provided at the jail.

53. Defendant Henderson also knew that Nurse O'Neal had left the jail and that no other medical provider was at the jail that morning.

54. Despite being told by Nurse O'Neal that Ms. Sims needed immediate medical attention and observing himself that she needed immediate medical attention, Lt. Henderson did not call for an ambulance or other emergency medical transport.

55. Defendant Henderson instead waited over three hours before having an officer transport Ms. Sims to a hospital.

56. Defendant Henderson directed that Ms. Sims be transported to a hospital in a patrol car.

57. Defendant Henderson directed that Ms. Sims be taken to a hospital that was a 45-minute drive from the jail, even though the closest hospital was a 15-minute drive from the jail.

58. Ms. Sims arrived at the hospital 4 hours after a medical provider informed Defendant Henderson that she needed immediate medical attention.

59. Defendant Henderson's delay meant that Ms. Sims spent at least 4 hours knowing that she required emergency medical treatment and was being denied emergency treatment and palliative care.

60. Defendant Henderson's delay caused Ms. Smith mental anguish and prolonged her physical pain and suffering.

61. Lt. Henderson's delay in obtaining medical care for Ms. Sims constituted deliberate indifference to her medical needs in violation of the Fourteenth Amendment.

## Count IV

62. This count is alleged against Defendant Faith Family Practice, LLC, and Defendant FFP Sub, LLC by all Plaintiffs. This count incorporates the allegations set forth in paragraphs 1 through 40.

63. For all claims that arise under Georgia law, Plaintiffs seek attorneys' fees under O.C.G.A. § 13-6-11 on the basis of the bad faith of Defendant Faith Family Practice, LLC and Defendant FFP Sub, LLC.

## Request for Relief

Plaintiffs request this Court:

a. hold a trial by jury on all issues so triable;

b. award compensatory damages to the Estate of Betty Sims against each Defendant for pre-death pain and suffering;

c. award the Estate of Betty Sims funeral and burial expenses to against each Defendant;

d. award the Estate of Betty Sims punitive damages against Defendant each Defendant;

e. award the Estate of Betty Sims reasonable attorney's fees under 42 U.S.C. § 1988 against Defendant Henderson;

 f. Award damages to Plaintiffs Herrin, Sabatino, O'Neal, and Simmons against Defendant Faith Family Practice, LLC, and Defendant FFP Sub, LLC, for the value of Ms. Sims' life;

 g. award all Plaintiffs reasonable attorney's fees under O.C.G.A. § 13-6-11 against Defendant Faith Family Practice, LLC and Defendant FFP Sub, LLC.

 h. award such other further legal or equitable relief to which Plaintiffs are entitled, whether explicitly pleaded or not.

Submitted on August 6, 2024.

 

SPEARS & FILIPOVITS, LLC
315 W. Ponce de Leon Ave., Ste. 865
Decatur, Georgia 30030
404-905-2225
jeff@civil-rights.law
wingo@civil-rights.law

**s/Jeff Filipovits**
Jeff Filipovits
Georgia Bar No. 825553

**s/Wingo F. Smith**
Wingo F. Smith
Georgia Bar No. 147896

**s/Alex Mayfield**
Alex Mayfield
Georgia Bar No.

MAYFIELD LAW
1611 Union Street
Brunswick, GA 31520
(912) 457-8557
Alex@mayfieldinjury.com

11